PEOPLE v. BRIEN.

(Supreme Court, Appellate Term. May 12, 1909.)

FOOD (§ 16*) — OLEOMARGARINE — PENALTIES AND ACTIONS THEREFOR — SUFFICIENCY OF EVIDENCE.

In an action by the people to collect a penalty for alleged violations of the agricultural law relating to the sale of oleomargarine, evidence *held* insufficient to sustain a judgment for plaintiff.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 16.*]

Goff, J., dissenting.

Appeal from Municipal Court, Borough of Manhattan, Third District.

Action for penalty by the People against Henry Brien. Judgment for the People, and defendant appeals. Reversed, and new trial ordered.

Argued before GILDERSLEEVE, P. J., and GOFF and DAYTON, JJ.

Breed, Abbott & Morgan, for appellant.
Manton M. Wyvell, for the People.

GILDERSLEEVE, P. J. This is an appeal from a judgment in favor of plaintiff rendered by the court without a jury. The action was brought by the people of the state to collect a penalty of $100 for the alleged violations of the provisions of the New York agricultural law (Laws 1893, p. 655, c. 338) relating to the sale or use of "the article known as oleomargarine or any article or product in imitation or semblance of natural butter." The plaintiff has proved that defendant sold to inspectors of the state Department of Agriculture a one-pound print of oleomargarine, and that the said print was clearly branded

"Oleomargarine." It was established at the trial that the article was not sold as butter; that the article was oleomargarine, looked like oleomargarine, tasted like oleomargarine, and smelled like oleomargarine. The state's chemist testified that the product had all the characteristics of oleomargarine, that there was no coloring matter present that is not in oleomargarine, that there was no artificial coloring matter present, that what color there was was inherent to the fats of which oleomargarine is made, and that the product resembled "some uncolored winter butter." It was also proved that the product contained milk. Upon this point the state's own chemist, who swore that he had been analyzing products of this character for 18 years, testified as follows:

"Q. (by the Court). There is milk in oleomargarine? A. Yes; it is almost universally used in it. Q. Is it not a fact that all genuine oleomargarine contains milk? A. All; practically all; all that I have personally seen or read about. Q. Did you find in this sample any ingredient which you would characterize in your experience as foreign to oleomargarine? A. I did not. Q. Did you find any ingredient that did not have food value? A. I did not."

This case seems to come within the authority of People v. Hale and People v. Fried, 62 Misc. Rep. 240, 114 N. Y. Supp. 945, unless it be that a difference is caused by the label which prefixes the word "Holstein" to the word "Oleomargarine." Holstein is a well-known breed of cows, and can it be said that such advertisement was likely to deceive people into believing that they were purchasing butter? We think not, especially in view of the fact, as above stated, that milk did enter into the composition of the oleomargarine in question. The only inference to be drawn from this advertisement was that Holstein milk was used in the making of the oleomargarine, which may have been a fact.

Further down on the label (plaintiff's Exhibit B) appears the following:

"Please notice this package of 'Holstein' conforms strictly to the pure food laws of the United States," etc.

The word "Oleomargarine" should have been added to "Holstein"; but in view of the upper part of the label, clearly setting forth the words "Holstein Oleomargarine," this omission can hardly have deceived the purchaser into believing that he was buying butter.

The judgment should be reversed, and a new trial ordered, with costs to appellant to abide the event, with leave to appeal to the Appellate Division.

DAYTON, J., concurs.

GOFF, J. (dissenting). The agricultural law (Laws 1893, p. 666, c. 338) in section 36 declares the purpose of its enactment is "to prevent deception in the sale of dairy products." Section 164, as added by Laws 1903, p. 1191, c. 524, § 1, makes it unlawful to "sell * * * any article of food which is * * * misbranded within the meaning of this act"; and section 165, as added by Laws 1903, p. 1191, c. 524, § 1, and amended by Laws 1905, p. 141, c. 100, § 1, says that:

"An article of food shall be deemed to be misbranded * * * if the package containing it or its label shall bear any statement regarding the in-

gredients or the substances contained therein which statement shall be false or misleading in any particular."

The facts are undisputed. Defendant sold a pound of "butterine," and so billed it. On analysis its ingredients were found to be "beef fat, lard or oil fat, and some curd of milk." Attached to the butterine was a label which bore on top in red letters the words "Absolutely Pure." Then followed the name "John F. Jelke Co." and what purported to be a trade-mark. Immediately below, in large blue ornamental letters extending the full width of the label, was the word "Holstein," and beneath in skeleton letters of lesser size was the word "Oleomargarin." A blank space intervened, and then a line, "Please Notice," followed in form by a paragraph which read:

"This package of 'Holstein' conforms strictly to the pure food laws of the United States, is absolutely free from coloring·matter, and is churned under Danish process with the greatest care to preserve the fine flavor and taste of pure cream and milk."

The first words on the label, "Absolutely Pure," indicate the purity of something. Manifestly not that of the manufacturer or the trademark. Reasonably construed, they must refer to the quality of "Holstein" or of "Oleomargarin," for there is nothing on the face of the label to show that the two words are used as a compound. There is no hyphen, or anything typically to show connection. Conspicuously different type is used for the different words on different lines. It therefore becomes necessary, in order to give meaning to the words, to consider them separately, and regard one as the subject and the other as descriptive. Following this rule, it must be accepted that what is meant is a particular brand or variety of oleomargarin. Therefore it differs from the ordinarily recognized manufactured product known as "oleomargarine." Wherein is the difference? Does it lie in the materials used, the method of mixture or blending, or the place of manufacture? Both evidence and label are silent. Recourse must be had, therefore, to the accepted meaning of the word "Holstein," which may have one of two applications, according to the sense in which it is used. In one it may refer to the geographical or political division of the kingdom of Prussia known as the duchy of Holstein; in the other it may refer to a well-recognized breed of cows, known as the "Holstein" and reputed to be prolific milk givers. All of the surrounding circumstances preclude the idea that the former application was intended, while with equal force they impel the conclusion that the latter application was the one intended. That being so what relation did the "Holstein" cow have to "Oleomargarin"? Absolutely none, for the cow yields milk from which the natural dairy butter is made, while this "Oleomargarin" was made from beef and lard fats, as distinguished from the characteristic butter fats, as testified to by the chemist.

In the pictorial aspect of this label the word "Holstein" stands out so prominently that the eye is arrested, and must, in the field of vision, read in connection the words "Absolutely Pure." Then, to make sense, it must read: "Absolutely Pure Holstein Oleomargarin" and the meaning intended to be conveyed is that it was oleomargarine made from absolutely pure milk from the Holstein cow. If this were not so,

why the use of the word "Holstein"?  Why the prominence given to it over all other words?  It certainly was meant for something, and that something was to utilize the popular regard for the pure milk of the Holstein cow in palming off a product made of animal fats.  No other rational meaning can be deduced.  It would appear a contradiction in terms that "Oleomargarine" could deceive any one as meaning the natural product of the dairy; but this label does not say "Oleomargarine."  It says "Oleomargarin."  While that form of spelling the word may be correct according to dictionary standards, the popular way, which has the approval of statutory form, is "Oleomargarine"; and while that as an isolated circumstance might be disregarded, yet, taken in connection with all the other circumstances, it is of serious significance.

The view taken is amply sustained by the "Notice."  It says "This package of 'Holstein.'"  It does not say this package of "Oleomargarine."  "Holstein" is the commodity to which attention is called; "Holstein" and not "Oleomargarin," is the thing that "conforms strictly to the pure food laws of the United States."  But, even taking it to mean "Holstein Oleomargarin," the statement is not true.  What is meant, evidently, is the "Food and Drug Act."  Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1907, p. 928).  By that act:

"The term 'label' applies to any printed matter upon or attached to any package of a food * * * product." Section 8, regulation 17.

(a) And the "label shall consist * * * of the name of the * * * product, * * * in the case of food compounds, * * * mixtures or blends, the words 'compound,' 'mixture,' or 'blend.'"

(b) "Descriptive matter upon the label shall be free from any statement regarding the article * * * which is false or misleading in any particular."

(e) "Putting together two or more products is a compound." Regulation 27. "An article containing more than one food product * * * is misbranded if named after a single constituent." Regulation 17.

(f) "A compound shall be deemed misbranded if the label be incomplete as to the names of the required ingredients." Regulation 24.

So that in three particulars this compound of beef fat, lard fat, and curds of milk fails to comply with the very law it invokes as a guaranty.  The "Notice" continues:

"And is [the Holstein] churned under Danish process with the greatest care to preserve the fine flavor and taste of pure cream and milk."

In order to preserve the fine flavor and taste, the pure cream and milk must have been present.  They were not present.  Fats were present.  How could the churning of them by the "Danish" or any other process preserve the fine flavor and taste of pure milk and cream?  That the written description of the article sold, as well as the printed description set forth on the label, were misleading and calculated to deceive, there can, in my opinion, be no reasonable doubt.  The very purpose of the act (section 36), to prevent deception in the sale of dairy products, was sought to be defeated, the form and matter of the printing on the label were calculated to deceive and mislead, and the article sold was in fact misbranded.

This case is clearly distinguishable from those decided at the Appellate Term of this court in February, 1909, and reported together in

62 Misc. Rep. 240, 114 N. Y. Supp. 945. "In the Hale Case and in the Fried Case [to quote the words of Mr. Justice Gildersleeve, writing for the court] the oleomargarine was sold exactly for what it was, and that it contained only those substances which are inherent and recognized properties of oleomargarine. In the Simpson-Crawford Case there is some appearance of a conflict of proof upon an essential point." In the two first cases mentioned there was no misbranding, or misleading, or attempt to deceive, while in the case at bar all three were present. In the third case there was a conflict of proof; here the proof is complete and unquestioned. The purpose of the agricultural law to prevent deception in the sale of dairy products is beneficent to the whole people, and it should not be defeated by any device or design, no matter how skillful the disposal of words, or how ingenious the employment of language.

The judgment should be affirmed, with costs to respondent.